# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 13 |
| STEPHEN A. DOUCETTE, | ) Case No. 13-10915-JMD |
| | ) |
| Debtor. | ) |
| _____ | ) |
| TD BANK, N.A., | ) **Hearing Scheduled:** |
| | ) May 21, 2013 |
| Movant, | ) 9:00 a.m. |
| | ) |
| v. | ) **Objections Due:** |
| | ) May 14, 2013 |
| STEPHEN A. DOUCETTE, Debtor, | ) |
| | ) |
| and | ) |
| | ) |
| ELIZABETH S. DOUCETTE, Codebtor, | ) |
| | ) |
| and | ) |
| | ) |
| LAWRENCE P. SUMSKI, ESQ., Trustee, | ) |
| | ) |
| Respondents. | ) |

## TD BANK, N.A.'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR RELIEF FROM AUTOMATIC AND CODEBTOR STAYS

NOW COMES TD Bank, N.A. (the "Bank"), by and through its counsel undersigned and, pursuant to 11 U.S.C. §§ 105, 362, 521, 1307, 1322, and 1325, Federal Rules of Bankruptcy Procedure 9013 and 9014, and LBR 4001-1 and 7101, hereby seeks the dismissal of this Chapter 13 case or, in the alternative, an Order granting the Bank relief from the operation of the automatic and codebtor stays with respect to the Property (as defined below), pursuant to 11 U.S.C. §§ 362(d) and 1301(c), and as grounds therefor states as follows.

## I. **Jurisdiction and Venue**

1.     The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), (L), and (O).  Venue is proper before this Court pursuant to 28 U.S.C. § 1409(a).

## II. **Background**

2.     On April 5, 2013 (the "Filing Date"), Debtor file an original voluntary petition under 11 U.S.C. Chapter 13 of the United States Code (the "Code").

3.     Property of the estate includes a certain parcel of property located at 6 Katie Lane, Hampstead, NH 03841 (the "Property").

4.     The Bank is a creditor of Debtor and Debtor's estate, possessing a secured claim in the amount of $59,152.77, plus accruing interest, costs, expenses, and fees.

5.     On July 18, 2002, Debtor and Elizabeth S. Doucette ("Codebtor") executed and delivered to Banknorth, N.A. ("BN") a certain Home Equity Line of Credit Agreement and Disclosure Statement with a credit limit in the amount of $50,000 (the "Note"), a true copy of which is attached hereto as Exhibit A.

6.     To secure the Note, Debtor and Codebtor executed and delivered to BN, a certain Home Equity Line Mortgage Deed (the "Mortgage"), which Mortgage is recorded in the Rockingham County Registry of Deeds in Book 3805, Page 2026, and a true copy of which is attached hereto as Exhibit B.

7.     The Bank is the successor in interest to BN, and is the holder of the Note and the Mortgage.

A.    **The 2011 Case**

8.    On April 14, 2011, Debtor filed an original Voluntary Petition under Chapter 13 of the Code, commencing Case No. 11-11500-JMD in this Court (the "2011 Case").

9.    Prior to the filing of the 2011 Case, the Bank had issued a Notice of Auction with respect to the Property scheduled for October 22, 2010, which auction was rescheduled a number of times due to Debtor's conduct.  The last rescheduled Notice of Auction was issued on March 24, 2011, setting an auction date of April 13, 2011.

10.    Upon receipt of notice that Debtor had commenced the 2011 Case, the Bank cancelled the auction.

11.    In the 2011 Case, Debtor failed to file his Schedules, Means Test, Attorney Disclosure Statement, Summary of Schedules, Statistical Summary of Certain Liabilities, Verified Statement Regarding Matrix, Notice to Consumer Credit Counseling form, and Chapter 13 Plan (the "2011 Required Filings").  In spite of filing two motions to extend the deadline to file the 2011 Required Filings, which Motions were granted, Debtor never filed the 2011 Required Filings.

12.    Debtor voluntarily dismissed the 2011 Case on May 23, 2011.

13.    The Bank then once again attempted to proceed with its auction sale of the Property.  In the interim, Debtor and Codebtor sought a modification of the Note, but those efforts failed, and the Bank sought to proceed with its auction of the Property.

B.    **The January 2013 Case**

14.    On January 23, 2013, Debtor filed his second original Voluntary Petition under Chapter 13 of the Code, commencing Case No. 13-10146-JMD in this Court (the "January 2013 Case").

15.     Debtor did not initially file his Schedules, Statements, or proposed Plan (the "2013 Required Filings"), and he again requested an extension of time to file the 2013 Required Filings, which was granted.  The 2013 Required Filings were due to be filed by February 24, 2013.  The 2013 Required Filings were never filed.

16.     On March 11, 2013, this Court entered an Order dismissing the January 2013 Case based on Debtor's failure to file the 2013 Required Filings.

17.     Thereafter the Bank, on March 19, 2013, issued another notice that an auction sale was scheduled for April 5, 2013.

18.     The April 5, 2013 auction was then continued to April 8, 2013.

19.     On April 3, 2013, the Bank received an email from Debtor requesting a further continuance of the auction sale of the Property.  Debtor's email stated as follows:  "I do not want to re[file] the bankruptcy 7 or have my wife file 13 bu[t] I will if it is the only way to delay sale while I continue working on other[] alternatives."  A true copy of the email from Debtor to Bank's counsel is attached hereto as Exhibit C.  Debtor did not state what "other alternatives" he was working on.

**C.     The April 2013 Case**

20.     On the Filing Date (April 5, 2013), one business day before the Bank's scheduled auction sale of the Property, Debtor commenced this case, his third in less than two years.

21.     Again, Debtor has not filed his Schedules, Statements or Plan.  Pursuant to Federal Rule of Bankruptcy Procedure 1007, the Schedules, Statements, and Plan are due April 19, 2013.

- 4 -

D. **The Note and Mortgage**

22.     Debtor and Codebtor are in default of their obligations to the Bank under the Note and Mortgage.

23.     The current monthly payment amount due under the Note varies.  As of April 8, 2013, the total payment arrearage under the Note was $7,773.59.  That arrearage consists of the following past due payments:

(i)     Prepetition – October 2012 through March 2013.

24.     As of April 8, 2013, the total amount due under the Note was $59,152.77 (consisting of: principal – $49,838.93; accrued interest – $4,638.54; late charges – $447.56; Payoff – $42.00; and fees assessed – $4,195.74).[1]

25.     The Bank estimates the fair market value of the Property to be $256,000.

26.     The Bank is unaware of any other existing liens or encumbrances on the Property, except for a first priority mortgage held by JPMorgan Chase Bank, N.A.

### III.  Discussion

A. **Motion to Dismiss**

27.     Debtor's case has been filed in bad faith and it should be dismissed pursuant to § 1307(c) of the Code.  Pursuant to § 1325(a)(7) of the Code, Debtor's filing of his petition must be in good faith.  "There are two separate and distinct tranches of good faith in Chapter 13 cases. The debtor must both have filed the Chapter 13 case in good faith and proposed the Chapter 13 plan in good faith."  *In re Torres Martinez*, 397 B.R. 158, 165-166 (B.A.P. 1st Cir. 2008).

28.     "Cause' is not specifically defined by the Bankruptcy Code, but filing a petition with a lack of good faith may constitutes sufficient 'cause' under Section 1307(c) to either

---

1  Plus all allowable and accruing interest, costs, and expenses due under the Note.

convert or dismiss a case." *In re Spaulding*, 2005 Bankr. LEXIS 3190, *12 (Bankr. M.D.N.C. 2005) (citation omitted).

> The obligation of good faith is imposed on the debtor at two stages of a Chapter 13 proceeding.  First, the debtor must file her Chapter 13 petition in good faith. Second, the debtor must file her Chapter 13 plan in good faith. . .  The term "good faith" is not defined, and, therefore, the good faith inquiry is a "fact intensive determination better left to the discretion of the bankruptcy court."  Courts differ in their approach in determining a debtor's good faith, but the majority favor a totality of the circumstances analysis.

*In re Cabral*, 285 B.R. 563, 572 (B.A.P. 1st Cir. 2002); *see also In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987) (totality of circumstances for bad faith analysis includes "debtor's history of filings and dismissals.").

29.     Debtor has made it clear that he intends to use the Code and bankruptcy generally to stall again the Bank's efforts to exercise its appropriate state law rights and remedies with respect to the Property.  As Debtor stated in his email to the Bank, he is simply using the bankruptcy process to prevent the foreclosure but without any actual plan to otherwise meet his obligations as a Debtor under the Code.  *See* Exhibit C ("I do not want to re[file] the bankruptcy 7 or have my wife file 13 bu[t] I will if it is the only way to delay sale while I continue working on other[] alternatives.").  Debtor's email further indicates his willingness to use Codebtor as the filing party to further delay the auction sale of the Property and to prevent the Bank from exercising its state law rights regarding the Property.

30.     In addition, Debtor's failures to meet his filing requirements in the 2011 Case and the January 2013 Case demonstrate his lack of seriousness in adhering to necessary and required filings under the Code, and he is on track to do the same thing in this case.  Debtor again filed a skeleton petition without Schedules, Statements or a Plan.  Due to Debtor's conduct in again not

pursuing this case as a responsible debtor, compounded by his acting in the identical manner in the 2011 Case and the January 2013 Case, the Bank submits that this case was filed in bad faith.

31. Because Debtor's filing is in bad faith, he will not be able to confirm a plan, and the case should be dismissed under §1307(c)(3) or (5).

### B. <u>The Bank Is Entitled to Relief from Stay and/or In Rem Relief</u>

32. Alternatively, should the Court conclude or refrain from ruling on the Bank's request that the case be dismissed, the Bank requests the alternative relief of an Order granting the Bank relief from the operation of the automatic and codebtor stays to proceed with the auction sale of the Property. The Bank asserts that all the facts and circumstances giving rise to cause for the dismissal of the case also constitute "cause" within the meaning of § 362(d) of the Code for the granting of the Bank from relief from the automatic stay.

33. Specifically:

(i)    The Bank's interest in the Property is not adequately protected. *See* 11 U.S.C. § 362(d)(1);

(ii)    the Property is of no or inconsequential value to the estate. *See* 11 U.S.C. § 362(d)(2);

(iii)    the non-payment of current amounts due on a timely and regular basis pursuant to the terms of the Note constitutes "cause" in a Chapter 13 proceeding for relief from the automatic stay pursuant to § 362(d)(1) of the Code; and

(iv)    bad faith filing constitutes "cause" for relief from the automatic and codebtor stays under §§ 362 and 1301 of the Code.

34. Further, due to the facts and circumstances described above, the Bank's interest in the Property would be irreparably harmed by continuation of the codebtor stay provided by 11 U.S.C § 1301(a) and, therefore, this Court should grant the Bank relief from the codebtor stay to collect all or any part of Debtor's and Codebtor's obligations to the Bank from Codebtor, pursuant to 11 U.S.C. § 1301(c)(3).

35.     Finally, the Bank asserts that the facts and circumstances of this case warrant in rem relief pursuant to § 362(d)(4) of the Code.  *In re Gonzalez-Ruiz*, 341 B.R. 371, 384 (B.A.P. 1st Cir. 2006) ("An order granting in rem relief from stay is an appropriate remedy when a debtor or transferee of a debtor serially files bankruptcy petitions solely to invoke the automatic stay.")  Here, Debtor has indicated that he is filing solely to stall the foreclosure on the property, with indication that he would use Codebtor to file for the same purpose.  Accordingly, in rem relief is warranted.

36.     Pursuant to LBR 7102(d), Bank's counsel states that he has made a good faith attempt to obtain concurrence in the relief sought, and that he could not determine whether the Debtor consents to the relief requested in the Motion.  Bank's counsel has not contacted Codebtor.

37.     As the Chapter 13 Trustee filed a Motion to Dismiss, the Bank believes that the Trustee would support either dismissal or relief from the automatic and codebtor stays in this instance.

## IV.  <u>Conclusion</u>

WHEREFORE, Secured Creditor, TD Bank, N.A., requests that the Court: (i) order that Debtor's Chapter 13 case be dismissed or, alternatively grant the Bank relief from the operation of the automatic and codebtor stays with respect to the Property; and (ii) grant the Bank such other and further relief as is just and appropriate under the circumstances.

Dated at Portland, Maine this 16th day of April, 2013.

/s/ Anthony J. Manhart
Anthony J. Manhart, Esq.
Counsel for creditor,
TD Bank, N.A.

Perkins Thompson, P.A.
One Canal Plaza, PO Box 426
Portland, ME  04112-0426
(207) 774-2635
amanhart@perkinsthompson.com

**EXHIBIT A**

Banknorth, N.A.

## HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE STATEMENT

Date: July 18, 2002                                  Account No.            9467

In this Line of Credit Agreement and Disclosure, the words "you", "your" and "the Bank" mean

Banknorth, N.A. with an office at 10 Main Street, Route 121, Hampstead, NH

The words "I", "me" and "borrower" mean
Stephen A Doucette of 6 Katie Lane, Hampstead, NH  03841
Elizabeth S Doucette of 6 Katie Lane, Hampstead, NH  03841

1. **PROMISE TO PAY.** I promise to pay the Bank all sums of money borrowed under this Agreement, plus finance charges, and any other charges I am required to pay under this Agreement or under the Mortgage Deed ("Mortgage") securing the loans made under this Agreement. Repayment will be as described below. If I fail to comply with any part of this Agreement or Mortgage, but the Bank allows me to correct my failure to comply or to continue to borrow and repay under the agreement, I cannot claim the Bank has given up the right to require me to comply in the future. This is a variable rate credit agreement, and the finance charges I will pay will change according to the terms described below.

2. **SECURITY.** All loans made to me under this Agreement and my performance of all of my obligations under this Agreement are secured by a Mortgage dated July 18, 2002     to be recorded in the Rockingham County Registry of Deeds Land Record, on real estate located at     6 Katie Lane, Hampstead, NH  03841 . Insurance on the real estate is required by the Mortgage and may be obtained from anyone I choose who is reasonably acceptable to you.

3. **LOANS.** You will provide me with special checks (Equity Line Checks) that may be used to obtain advances (Loans). I may obtain Loans as long as such advances do not cause any loan balance to exceed my Credit Limit. I can obtain loans by using an Equity Line Check. Additionally, the Bank may elect to provide an advance at my request. Such requests must be made directly with the Bank and if the request is approved, the proceeds will be provided directly to me either as a deposit to my account with the Bank, or in the form of an official Bank check, or other disbursement method that you approve. You may elect not to honor any check you receive which is post-dated or which is dated more than six months prior to the date the check is presented to you. If you honor such checks, at your sole discretion, I agree that such checks shall be considered an advance. You may also lend me money in the same way for any fees or charges due under this Agreement. There is no minimum loan amount.

4. **CREDIT LIMIT.** My credit limit is the maximum amount of money you will make available to me under this Agreement that will be outstanding at any time. My Credit Limit is  $50,000.00     I will not let my unpaid balance go over my Credit Limit. If I reach my limit the Bank need not advance me any more money until the Bank may return or elect to pay any items. If I exceed my credit limit, an overlimit fee of $25.00 will be charged.

5. **FINANCE CHARGES.** If you make any loans to me, I will pay a finance charge based on the computation method described in this paragraph. The FINANCE CHARGE begins to be charged on the date of each new loan and continues until paid in full. The finance charge will be calculated by multiplying the Average Daily Balance times the daily periodic rate then multiplying the result by the number of days in the billing cycle. The initial daily periodic rate will be . 01303 3% .     The daily periodic rate is 1/365th of the ANNUAL PERCENTAGE RATE (APR). The initial ANNUAL PERCENTAGE RATE under this Agreement is 4.750% . The Annual Percentage rate includes only interest and no other costs. The average daily balance is computed by adding together each day's ending balance during the billing cycle including new loans  and fees or charges and subtracting any unpaid finance charges, payments and credits.  Then you divide the total by the number of days in the billing cycle.  This gives the Average Daily Balance.

6. **ADJUSTMENTS TO APR AND LIMITS ON CHANGES.** The Annual Percentage Rate ("APR") is subject to change each billing cycle without limit except that it will not go above 18%.     My APR will be adjusted each billing cycle to an annual rate equal to .000% ("Margin") added to the highest domestic Prime Rate as published in The Wall Street Journal on, or in effect on the first day of each billing cycle for this account ("Index"). Any change in my APR will take effect on the first day of the billing cycle.  The new APR will be applied to the then current billing cycle's average daily balance.  Changes in the APR warranted by a change in the Index will be automatic.

The Bank will not send me notice of a new APR except on my next statement on my regular billing date. If the APR increases, the Finance Charge and monthly payment on the same balance will be higher. However, an increase may be foregone at the Bank's option. If the bank foregoes an APR increase, the Bank may increase the APR at a later change date.

7. **UNAVAILABILITY OF INDEX.** If for any reason the Index is temporarily unavailable, the APR on my line will remain fixed for up to 30 days at the rate set at the last adjustment, but only until the Index is available again. If the Index becomes unavailable for 30 days or more, a new index and if necessary, a new margin, substantially similar to the discontinued one will be designated by you.

8. **DRAW PERIOD, REPAYMENT PERIOD AND MINIMUM PAYMENTS.** During the "Draw Period" , I can obtain loans up to my Credit Limit until the Draw Period terminates. The Draw Period is for five (5) years. The Bank may, in its sole discretion, renew my rights to get loans under this Agreement at the end of the Draw Period for an additional five (5) year period ("Renewal Draw Period".) I will have a Renewal Draw Period unless the bank notifies me in writing  that my Draw Period has terminated and will not be renewed. During the Draw Period and the Renewal Draw Period, I must repay the loans under this Agreement by making at least the minimum monthly payment. I'll pay at least the minimum payment no later than the date shown on the last statement as the next "payment due date". All payments will be applied first to interest and then to other amounts owed and finally to principal. The minimum payment will be the interest accrued on the principal balance of the loan or $25.00, whichever is larger, plus any credit life insurance premium I may owe, plus any amount you have loaned me over my Credit Limit. If my new balance is less than the minimum payment amount, I'll pay the new balance.

*Line of Credit/Disclosure  Page 1 of 4*                    Initial

I understand that the minimum payment may not reduce the principal that is outstanding on my line of credit. If I do not make my minimum monthly payment, it is possible that "negative amortization" will result. Negative amortization will increase the amount that I owe you and reduce my equity in my home.

After the Draw Period and Renewal Draw Period ends, I will no longer be able to obtain loans under this Agreement and I must repay the outstanding balance. This is called the "Repayment Period". I must repay to you all amounts I owe under this Agreement no later than ten (10) years from the start of the Repayment Period. During the Repayment Period, my minimum monthly payments will be equal to the sum of (i) the greater of $50.00 or 1/120 of the outstanding principal balance at the start of the Repayment Period plus (ii) the finance charges that have accrued on the outstanding principal balance plus (iii) any credit life insurance premium I may owe. If I do not make my minimum monthly payment, it is possible that "negative amortization" will result.
I have the right to pay off the new balance in full or in part at any time before it is due without penalty.

9. OTHER CHARGES. I agree to pay the following charges.

| | | |
|---|---|---|
| Recording Fees $_____ | Title Opinion or Insurance $_____ | Title Check $_____ |
| Appraisal $_____ | Document Preparation $_____ | Mortgage Tax $_____ |

10. CREDIT LIFE INSURANCE. I am not required to buy credit life insurance to obtain credit. If I want this protection, I must be acceptable to the Bank's insurer, and I must sign the necessary application for insurance and agree to pay the premium. The maximum coverage now available is $50,000.00 regardless of my maximum Credit Limit, but the maximum coverage available may change from time to time and I agree that you may increase or decrease my coverage to meet such maximums. I will pay an insurance charge computed by applying the 12/365 of monthly rate, as described in the credit life insurance application, per $1,000 of the Average Daily Balance of the loan for the billing cycle times the number of days in the billing cycle. This rate is subject to change from time to time upon changes imposed by the insurer and I agree to pay such changed rates. I may terminate credit life insurance coverage by notice to you in writing.

11. ASSUMPTION. My Home Equity Line of Credit and Mortgage may not be assumed by a purchaser of my home.

12. DEFAULT. I will be in default:
(A.) if I don't make a minimum payment when due, or don't pay any balance over my Credit Limit when due;
(B.) if I engage in fraud or material misrepresentation in connection with this Agreement;
(C.) if I convey the property securing this Agreement or otherwise act or fail to act in a way that adversely affects your mortgage or your rights in the property;
(D.) if I (as sole borrower(s) obligated under this agreement) die;
(E.) if I become insolvent, or go into bankruptcy;
(F.) if I violate any part of this Agreement or Mortgage;
(G.) if I violate any material terms of a mortgage given as security for this Agreement; or
(H.) if in your reasonable judgement determine that my prospect of repaying the loans is significantly impaired by a material change in my financial condition.

A default by any one Borrower will be considered a default by all Borrowers. If I am in default under A., B., C., or D. above, the Bank can terminate this Agreement, can refuse to issue me additional loans under this Agreement and can demand payment of the total amount owed under this Agreement after giving me any notice required by law. If I am in default under A., B., C., or D. of the above, the Bank may suspend my right to additional loans or reduce my Credit Limit. Even if, at a time when I am in default, the Bank does not refuse to issue me additional loans or require me to pay immediately in full, the Bank will still have the right to do so if I am in default at a later time. I understand that a default under this Agreement will also be a default under the Mortgage. I agree to pay all of your reasonable attorney's fees, legal expenses, and other reasonable costs incurred in foreclosing or otherwise realizing on the real estate securing my obligations under this Agreement after a default.

13. SUSPENSION. The Bank may suspend my right to additional loans or reduce my Credit Limit:
(A) Upon my written request or that of any joint Borrower
(B) If the value of the dwelling securing this Agreement and Mortgage declines significantly below its appraised value.
(C) If a regulatory agency has notified you that continued loans would constitute an unsafe and unsound practice
(D) If the Annual Percentage Rate reaches the maximum rate;
(E) If I violate any material terms of this Agreement;
(F) If in your reasonable judgement determine that my prospect of repaying the loans is significantly impaired by a material change in my financial condition;
(G) If you are precluded by government action from imposing the Annual Percentage Rate agreed to;
(H) If the government action adversely affects your security interest so that its value is less than 120% of my credit line.
You will notify me in writing if you take any action under this paragraph. If the event causing the suspension under this Paragraph is no longer applicable, I may request in writing that you reinstate my credit privileges. If I request reinstatement of my credit privileges, all borrowers must make or affirm the request.

14. TERMINATION. The Bank may terminate this Agreement as provided in Paragraph 12. I may terminate this Agreement by notifying you in writing. After the Agreement is terminated, I must repay all the principal balance, accrued interest plus any other sums I owe to the Bank under this Agreement in one lump sum payment to the Bank. Any joint Borrower may terminate the Agreement as provided.

15. RIGHT OF SETOFF. If any part or all of my line is past due and I fail to pay you as agreed, you may to the extent permitted by law, without prior notice, take the amount owed to you of any accounts that I have with you.

16. CHANGE OF TERMS.   You may not change any terms of this Agreement unless I agree in writing at the time, except:
(A.) the substitution of a new index as provided in Paragraph 7;
(B.) insignificant changes to terms, or changes that will unequivocally benefit me for the remainder of the term of my line;
(C.) terminate or suspend additional loans or reduce my Credit Limit under certain circumstances as provided in Paragraphs 12 and 13;
(D.) changes the Annual Percentage Rate based on the Index as described in Paragraph 6; or
(E.) changes in the maximum insurance coverage available and changes in credit insurance rates as provided in Paragraph 10.
    You will provide me with all notices of any changes as required by applicable law.

17. BANK'S WAIVER.   If I have given a security interest in real or personal property or securities to the Bank, other than the mortgage described in Paragraph 2 under any agreement that says the property or securities may secure other loans, the Bank waives its right to apply such property or securities against money which I owe under this Agreement. This does not waive any right of "set-off" you may have against any accounts I have with you.

18. TAX DEDUCTIBILITY.   I should consult a tax advisor regarding the deductibility of interest and charges for this loan.

19. NOTICES.   Any notice you send me will be considered effective when it is delivered personally to me or mailed, postage-paid, to the last address you have for me in your records. Notice from me will be considered effective when you receive it in writing at the address shown on my statement. If this is a joint account, you can notify one of us and the notice will be effective for both of us. Also, one of us can notify you and you will consider it to be notice from all of us.

20.   THIS NOTICE CONTAINS IMPORTANT INFORMATION ABOUT MY RIGHTS AND YOUR RESPONSIBILITIES UNDER THE FAIR CREDIT BILLING ACT. I will notify the Bank in case of errors or questions about my bill. If I think my bill is wrong, or if I need more information about a transaction on my bill, I will write the Bank as soon as possible. The Bank must hear from me no later than 60 days after the Bank sent me the first bill on which the error or problem appears. I can telephone the Bank, but doing so will not preserve my rights. In my letter, I will give the Bank the following information:  (1.) my name and account number; (2.) the dollar amount of the suspected error; and (3.) a description of the error and an explanation, if I can, or why I believe there is an error. If I need more information, I will describe the item I am not sure about.

MY RIGHTS AND THE BANK'S RESPONSIBILITIES AFTER THE BANK RECEIVES MY WRITTEN NOTICE   The Bank must acknowledge my letter within 30 days, unless the Bank has corrected the error by then. Within 90 days, the Bank must either correct the error or explain why it believes the bill was correct. After the Bank receives my letter, it cannot try to collect any amount I question or report me as delinquent. The Bank can continue to bill me for the amount I question, including finance charges, and the Bank can apply any unpaid amount against my Credit Limit. I do not have to pay any questioned amount while the Bank is investigating, but I am still obligated to pay the parts of my bill that are not in question. If the Bank finds that it made a mistake on my bill, I will not have to pay any finance charges related to any questioned amount. If the Bank didn't make a mistake, I may have to pay finance charges, and I will have to make up any missed payments on the questioned amount. In either case, the Bank will send me a statement of the amount I owe and the date that it is due. If I fail to pay the amount that the Bank thinks I owe, the Bank may report me as delinquent. However, if the Bank's explanation does not satisfy me and I write to the Bank within 10 days telling the Bank that I still refuse to pay, the Bank must tell anyone it reports me to that I have a question about my bill. And, the Bank must tell me the name of anyone it reported me to. The Bank must tell anyone it reports me to that the matter has been settled between us when it finally is. If the Bank doesn't follow these rules, it can't collect the first $50 of the questioned amount, even if my bill was correct.

SEND INQUIRES TO:  BANK OPERATIONS CENTER   P.O. BOX 4900 LEWISTON, ME 04243-4900

21. EACH SIGNER LIABLE.   Although this Agreement may be signed by more than one person, I understand that I, as an individual, am responsible for paying back the entire amount owed under this Agreement. You may take direct legal action against me even though I may not have received any direct personal benefit from the loan. All persons who sign this Agreement are entitled to a copy of the Agreement.

22.   Equity Checks   I authorize and agree that the Bank will not send me the original or copies of actual, original access checks drawn on the Line of Credit to me.  I may request a copy of a check by writing to Bank Operations Department, Loan Research, P.O. Box 1377, Lewiston ME  04243-1377 or by calling 1-800-281-0025, extension 4335.  No fee will be charged to me for first requested copy of a check.  All additional copies of the check will be at a fee of $2.00 per copy.
23.   ACCOUNT RESEARCH. If I request your assistance in researching issues pertaining to this account, or in reconciliation of this account, I will be charged a research fee at a rate of $25.00 per hour, with a minimum charge of $10, for the time you spend assisting me and researching the account.  I may also be charged $2.00 for each photocopy of a document that I request.  If I have a billing error as discussed in Paragraph 20 above, I will not be charged a research fee or photocopy fee.

24.  LATE PAYMENT FEES.  If I fail to pay the minimum payment due at the mailing address shown on my statement on or before the fifteenth (15th) day following the payment due date, I may be charged a late fee equal to 5% of the minimum payment due.  This charge will be debited to my account automatically and itemized on my statement without further notice to me.

25.  STOP PAYMENT AND DISHONORED CHECK FEES.  Should I request a stop payment on any equity checks or should any checks or other means of payment received and applied to my account be returned to the Bank for insufficient funds or some reason, the Bank may elect to debit my account any fees or charges due.  The fee for stop payment is $22 per equity check and the fee for each dishonored payment check is $25.

26.  NOTICE OF ADDITIONAL ENCUMBRANCE. I will notify you in writing if any other mortgage, lien, attachment, lis pendens, legal proceeding, adjudication against the property securing this Agreement or any other encumbrance is recorded on the land records other than that did not exist on the date of this Agreement. I understand and agree that you may terminate this Agreement upon your receipt of such notice from me or any other party, and upon termination, I must repay the principal balance, accrued interest plus any other sums I owe to the Bank under this Agreement in one lump sum payment to the Bank.

Line of Credit/Disclosure  Page 3 of 4                                Initial_____

**27. EARLY TERMINATION FEE.** A $350.00 early termination fee will be charged if I close my account on or before the third anniversary of the date that the line was opened.

**29. Governing Law.** Applicable federal law and the laws of the Commonwealth or State of   New Hampshire   govern this Agreement including the rate of interest and fees.

**30. Cost of Collection.** Where permitted by applicable law, I agree to pay reasonable expenses, including attorneys' fees, incurred by you in realizing on any collateral or in enforcing your rights under this Security Agreement and the Mortgage.
You have the right to collect attorney's fees, if you prevail.

I acknowledge receipt of this completed Agreement.
Witness the execution hereof under seal as of the day and the year first above written.

Witness _Karen L Carney_                    Borrower: _Stephen A Doucette_

Witness _Karen L Carney_                    Borrower: _Elizabeth S Doucette_

Witness _____             Borrower: _____

Witness _____             Borrower: _____

BK3805PG2026

EXHIBIT B

✓ Processed by

DEC 0 6 2002

COLLATERAL

062808

2002 JUL 25  PM 2: 25

ROCKINGHAM COUNTY
REGISTRY OF DEEDS

Banknorth, N.A.       LN # ████9467
HOME EQUITY LINE MORTGAGE DEED

Mortgage dated as of   July 18, 2002

From

Stephen A Doucette ("Mortgagor" or "Borrower") of 6 Katie Lane, Hampstead, NH  03841
Elizabeth S Doucette ("Mortgagor" or "Borrower") of 6 Katie Lane, Hampstead, NH  03841

To    Banknorth, N.A., (the "Lender")
      with an office at 10 Main Street, Route 121, Hampstead, NH  03841

### Article 1: The Loan

1.  **Revolving Credit.**  The Lender has agreed to make loans and future advances (and readvances) from time to time to the Borrower in an aggregate principal amount at any one time outstanding not exceeding $ 50,000.00  (the "Credit Limit"). The loans are evidenced by and repayable with interest in accordance with a duly authorized and executed Equity Line of Credit Agreement and Disclosure Statement by the Borrower delivered to the Lender as of the date hereof and any amendments thereto and refinances thereof subsequent to date hereof (collectively "the Agreement").  The interest rate is a variable rate based upon an index described in the Agreement

2.  **Termination.**  The Borrower's right to borrow under the Agreement will terminate in the manner set forth in the Agreement.

3.  **Defaults.**  The occurrence of any of the following events shall constitute a default under this mortgage (each herein called an Event of Default):

    (a)    The Borrower engages in fraud or material misrepresentation in connection with the Borrower's application for or the Borrower's use of the Credit Line under the Agreement.

    (b)    Any Borrower does not meet repayment terms of the Agreement.

    (c)    Any Borrower's action or inaction adversely affects the Property subject to this Mortgage or the Lender's rights in that Property, including but not limited to  a transfer of the Property not permitted by this Mortgage, or the Borrower's failure to maintain required insurance on the Property, or the Borrower's failure to pay applicable real estate taxes on the Property.

    (d)    Any Borrower dies.

    (e)    Any Borrower becomes insolvent, or goes into bankruptcy.

    (f)    Any Borrower violates any part of the Agreement.

    (g)    Any Borrower violates any material terms of this mortgage.

    (h)    Any Borrower's prospect for repaying the loans is in the Lender's reasonable judgment significantly impaired by a material change in financial condition.

4.  **Remedies.**  If the Borrower is in default under (a), (b), (c) or (d) of paragraph 3, above, the Lender can terminate the Agreement, can refuse to issue the Borrower additional loans under the Agreement and can demand payment of the total amount owed under the Agreement after giving the Borrower any notice required by law.  If the Borrower is in default under any of the above, the Lender may suspend the Borrower's right to draw additional advances until the default is cured.  Borrower must notify Lender when default is cured.  Even if, at a time when the Borrower is in default, the Lender does not refuse to issue the Borrower additional loans or require the Borrower to pay immediately in full, the Lender will still have the right to do so if the Borrower is in default at a later time.  If, after receiving notices required by the applicable Federal and State laws, Borrower does not cure any defaults, Lender may foreclose upon the property.  The Lender may exercise a right of set-off against any accounts or other funds held by the Lender.  The Borrower agrees to pay all of Lender's reasonable attorney's fees, legal expenses, and other reasonable costs incurred in foreclosing or otherwise realizing on the real estate securing the Borrower's obligations under the Agreement after a default.

5.  **Notices.**  Any notice Lender sends Borrower will be considered effective when it is delivered personally to Borrower or mailed, postage-paid, to the last address Lender has for Borrower in its records.  Notice from Lender will be considered


initials

BK3805PG2027

effective when Borrower receives it in writing at the address shown on Borrower's statement. If this is a joint account, Lender may notify Borrower and the notice will be effective for Borrower and any co-Borrowers. Also, any notification received by Lender from Borrower will be considered effective for Borrower and any co-Borrower.

6. Exercise of Rights. No failure to exercise, and no delay in exercising, on the part of the Lender, any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

7. Joint and Several Obligation. If there is more than one Borrower, then all obligations of the Borrower hereunder and under the Agreement shall be joint and several and all references to the Borrower shall mean each Borrower.

8. Assignment. This Mortgage may not be assigned by Borrower without Lender's prior written consent. Obligations hereunder are binding upon the Borrower and the Borrower's heirs and legal representatives.

Article II: The Mortgage

To secure to Lender the repayment of the indebtedness up to the credit limit including all future advances (and readvances) evidenced by the Agreement, with interest thereon, and all amendments, refinances, renewals, modifications, and extensions of the Agreement, the payment of all of the sums with interest thereon advanced or readvanced in accordance herewith to protect the security of this Mortgage, and the performance of the covenants and agreements of Borrower contained herein and in the Agreement, for consideration paid or given, Borrower does hereby mortgage, grant, and convey to Lender, with Mortgage Covenants, upon the Statutory Condition, and with the Statutory Power of Sale, the following described property located in the

County of Rockingham, State of New Hampshire
which has an address of 6 Katie Lane, Hampstead, NH 03841

(herein referred to as "Property") which is more particularly bounded and described in "Schedule A" attached hereto and made a part hereof.
        Together with all the improvements now or hereafter erected on the Property, and all easements, rights, appurtenances, rents, royalties, mineral, oil, and gas rights and profits, water, water rights, and water stock, and all fixtures now or hereafter attached to the Property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property, and all of the foregoing, together with said property are herein referred to as the "Property". The attached SCHEDULE A is the Property's legal description.

BORROWER AND LENDER COVENANT AS FOLLOWS:

1. Payment of Principal and/or Interest. Borrower shall promptly pay when due the principal of and/or interest on the indebtedness evidenced by the Agreement, early termination and late charges as provided in the Agreement, and the principal of and/or interest on any other advances secured by this Mortgage. All payments will be applied first to interest and then to other amounts owed and finally to principal.

2. Charges; Liens. Borrower shall pay all taxes, assessments and other charges, fines, and impositions attributable to the Property which may attain a priority over this Mortgage. Borrower shall promptly furnish to Lender receipts evidencing such payments. Borrower shall promptly discharge any lien which has priority over this Mortgage; provided, that Borrower shall not be required to discharge any such lien so long as Borrower shall agree in writing to the payment of the obligation secured by such lien in a manner acceptable to Lender, or shall in good faith contest such lien by, or defend enforcement of such lien in legal proceedings which operate to prevent the enforcement of the lien or forfeiture of the Property or any part thereof.

3. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the terms "extended coverage" and such other hazards as Lender may require and in such amounts and for such periods as Lender may require; provided, that Lender shall not require that the amount of such coverage exceed the amount of coverage required to pay the sums secured by this Mortgage.
        All insurance policies and renewals thereof shall be in form acceptable to Lender and shall include a standard mortgage clause in favor of and in form acceptable to Lender. All insurance policies must contain a ten-day notice of cancellation by insurance carrier to Lender. Unless the holder of a prior mortgage is holding such policies, the Lender shall have the right to hold the policies and renewals thereof, and Borrower shall promptly furnish to Lender all renewal notices and all receipts of paid premiums. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.
        Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, provided such restoration or repair is economically feasible and the security of this Mortgage is not thereby impaired. If such restoration or repair is not economically feasible and the security of this Mortgage would be impaired, the insurance proceeds shall be applied to the sums secured by this Mortgage, with the excess, if any, paid to Borrower. If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within thirty (30) days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.
        Unless Lender and Borrower otherwise agree in writing, any such application of proceeds to principal shall not extend or postpone the due date of the monthly installments referred to in Section 1 of this Article II or change the amount of such installments. If under Section 14 below the Property is acquired by Lender, all right, title, and interest of Borrower in and to any insurance policies and in and to the proceeds thereof resulting from damage to the Property prior to the sale of

Initials ___

BK3805PG2028

acquisition shall pass to Lender to the extent of the sums secured by this Mortgage immediately prior to such sale or acquisition.

4.  Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.  Borrower shall keep the property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease in this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.  If a condominium or planned unit development rider is executed by the Borrower and recorded together with this Mortgage, the covenants and agreements of such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Mortgage as if the rider were a part hereof.

5.  Protection of Lender's Security.  If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, including, but not limited to, eminent domain, insolvency, code enforcement, or arrangements or proceedings involving a bankrupt or decedent, then Lender at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums and take such action as is necessary to protect Lender's interest, including, but not limited to, disbursement of reasonable attorney's fees and entry upon the Property to make repairs.  If Lender required mortgage insurance as a condition of making the loans secured by this Mortgage, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with the Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this Section 5, with interest thereon, shall become additional indebtedness of Borrower due and owing and secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof, and shall bear interest from the date of disbursement until paid in full at the rate payable from time to time on outstanding principal under the Agreement unless payment of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate permissible under applicable law.  Nothing contained in this Section 5 shall require Lender to incur any expense or to take any action hereunder.

6.  Inspection.  Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

7.  Condemnation.  The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Mortgage, with the excess, if any, paid to Borrower.  In the event of partial taking of the Property, unless Borrower and Lender otherwise agree in writing, there shall be applied to the sums secured by this Mortgage, such proportion of the proceeds as is equal to that proportion which the amount of the sums secured by this Mortgage immediately prior to the date of taking bears to the fair market value of the Property immediately prior to the date of taking, with the balance of the proceeds paid to the Borrower.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make and award or settle a claim for damages, Borrower fails to respond to Lender within thirty (30) days after the date such notice is mailed, Lender is authorized to collect and apply the proceeds, at Lender's option, either to restoration or repair of the Property or to the sums secured by this Mortgage.

Unless Lender and Borrower otherwise agree in writing, any such application of proceeds to principal shall not extend or postpone the due date of the monthly installments referred to in Section 1 of this Article II or change the amount of such installments.

8.  Environmental Hazards.  For purposes of this section, Environmental Hazards are those hazards and hazardous substances as defined under applicable Federal laws and State law (hereinafter "Environmental Laws").  Borrower will comply at all times with Environmental Laws concerning the Property, keeping it free from Environmental Hazards with or without being requested by Lender or governmental authorities.  Borrower shall immediately disclose to Lender in writing any information Borrower receives concerning the environmental status of the Property, including, but not limited to, any investigation, claim or legal action thereon whether by an individual or governmental entity.  Borrower further grants Lender the right to inspect the property for environmental contamination at any time upon reasonable notice.  Borrower understands and acknowledges that if environmental contamination is found on the Property, Lender may at its option terminate the Agreement, refuse to extend funds under the Agreement, demand payment of total amount due and foreclose upon the Property.  Borrower further agrees to defend, indemnify and otherwise hold harmless Lender from any environmental liability associated with the Property.

9.  Borrower Not Released.  Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successor in interest.  Lender shall not be required to commence proceeding against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest.

10.  Forbearance by Lender Not a Waiver.  Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable laws, shall not be a waiver of or preclude the exercise of any such right or remedy.  The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's right to accelerate the maturity of the indebtedness secured by this Mortgage.



Initials

BK3805PG2029

11. **Remedies Cumulative.** All remedies provided in this Mortgage are distinct and cumulative to any other right or remedy under this Mortgage or afforded by law or equity, and may be exercised concurrently, independently or successively.

12. **Successors and Assigns Bound; Joint and Several; Captions.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower subject to the provisions of Section 13 of this Article II. All covenants and agreements of Borrower shall be joint and several. The captions and headings of the paragraphs of this Mortgage are for convenience only and are not to be used to interpret or define the provisions hereof.

13. **Transfer of the Property.** If all or any part of the Property or and interest therein is sold or transferred by Borrower without Lender's prior written consent, which Lender may withhold in its sole discretion, excluding (a) the creation of a lien or encumbrance subordinate to this Mortgage, (b) the creation of a purchase money security interest for household appliances, (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant or (d) the grant of any leasehold interest of three years or less not containing an option to purchase, Lender may, at Lender's option, declare all the sums secured by this Mortgage to be immediately due and payable.

14. **Acceleration; Remedies.** Upon the occurrence of an Event of Default as defined in Article I, Section 3 or as otherwise provided in this Mortgage, Lender at Lender's option may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and Lender may invoke the other remedies permitted by applicable law. Lender shall be entitled to collect all reasonable costs and expenses incurred in pursuing the remedies provided in this Section 14, including, but not limited to, reasonable attorney's fees.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower in the manner provided by applicable law. Lender shall publish the notice of sale and the Property shall be sold in the manner prescribed by applicable law. Lender or Lender's designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all reasonable costs and expenses of the sale, including reasonable attorney's fees and costs of title evidence, (b) to all sums secured by this Mortgage; and (c) the excess, if any, to the person or persons legally entitled thereto.

15. **Assignment of Rents; Lender in Possession.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to the acceleration under Section 14 of this Article II or abandonment of the Property have the right to collect and retain such rents as they become due and payable.

Upon such acceleration or abandonment of the Property, Lender shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property, including those past due. All rent collected by Lender shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, reasonable attorney's fees, and then to the sums secured by this Mortgage. Lender shall be liable to account only for those rents actually received.

16. **Senior Lien.** Borrower represents and warrants that there are no prior mortgages in default and that no breach of covenant of any mortgage exists.

17. **Covenants Regarding Senior Lien.**
    (i)   Borrower shall not modify, amend, extend, refinance, renew, or borrow any additional amounts under any mortgage to which this mortgage is at any time subject or subordinate, or the debt or other obligation secured thereby, without prior written consent of the holder hereof;
    (ii)  Any default under any such prior mortgage or the obligations secured thereby, or which default Lender has knowledge, shall be a default hereunder, and the Lender shall be entitled (but not obligated) to cure such default and shall be reimbursed by the Borrower for all reasonable costs, charges and expenses, including without limitation reasonable attorney's fees, incurred in connection therewith, and all sums to which the Lender may be entitled to reimbursement shall be added to the principal sum of the debt secured hereby; shall earn interest at the same rate payable from time to time under the Agreement, shall be secured by this Mortgage and shall be payable on demand of the Lender, whether or not the remaining balance of said principal sum shall have been declared due and payable.

18. **Revolving Credit.** It is understood that this Mortgage secures an open-end credit plan providing for loans at a variable rate of interest as set forth in Article I hereof, and that from time to time the outstanding balance of loans made under said credit may change and may be zero. Notwithstanding such fact, this Mortgage granted hereby shall be and remain superior to any and all liens hereafter made or placed against the Property and such priority shall have effect with respect to all advances made under said revolving credit and any amendments thereto and refinances thereof subsequent to the date hereof to Borrower prior to an Event of Default as defined in Section 3 of Article I. It is understood Lender shall have the right, but not the obligation, to give the requisite notice to Borrower of an event which with notice and the passage of time would become an Event of Default if not cured.

19. **Amendment of Credit Agreement.** It is understood that this Mortgage secures a revolving credit agreement between Borrower and Lender and that no amendment, refinance, renewal, modification, or extension of said agreement shall affect the enforceability or priority of this Mortgage which shall act as security for said agreement as amended, refinanced, renewed, modified, or extended.

20. **Waivers/Release.** For the purposes of this Mortgage, the Mortgagor(s) releases and subordinates all rights of homestead exemption and waives all rights of curtesy and dower in the Property and hereby consents to all advances and readvances under the Agreement, all of which shall be deemed secured by this Mortgage, whether such advances or readvances are made by Borrower or any co-Borrower named in the Agreement.

Initials

BK3805PG2030

21. **Mortgage Discharge Recording Fee.** Upon Lender's request, Mortgagor(s) will pay any fee or charge that must be paid to record a discharge of this Mortgage.

**Please see attached "Exhibit A" for detailed property description.**

Witness the execution hereof under seal as of the day and the year first above written.

Witness _Karen L Carney_          _____ (signature) Stephen A Doucette

date 7-18-02

Witness _Karen L Carney_          _____ (signature) Elizabeth S Doucette

date 7-18-02

Witness _____         _____ (signature)

date

Witness _____         _____ (signature)

date

### The State of New Hampshire

County of _Rockingham_ , ss.

On this _18th_ day of _July_ , 2002 before me, a notary public or authorized officer, personally appeared _Stephen A Doucette + Elizabeth S. Doucette_ the Borrower who acknowledged the within Mortgage to be a free and voluntary act and deed for the uses and purposes therein expressed and that _they_ received a true copy of such instrument and desired that it be recorded as such.

_Karen L Carney_

KAREN L. CARNEY, Notary Public
My Commission Expires January 8, 2008

initials

**ADI REPORTING SERVICES**    BK3805PG2031
A division of Asset Discovery, Inc.  Tel: (800) 470-5522  Fax (888) 470-5522
463 Worcester Road, Suite 206
Framingham, MA 01701

## SCHEDULE A

6 Katie Lane
Hampstead NH 03841
Elizabeth S. Doucette & Stephen A. Doucette

**The land with the buildings thereon situated in Hampstead, Rockingham County, State of New Hampshire known and being numbered:  6 Katie Lane**

The premises are conveyed subject to and with the benefit of all rights, rights  of way, easements, appurtenances, reservations, restrictions, and layouts and  takings of record, insofar as they are in force and applicable.

Meaning and intending to mortgage the same premises by deed of Joseph D. DeDonato, Jr. and Lee B.C. DeDonato to Elizabeth S. Doucette and Stephen A. Doucette, dated 09/28/1995 and filed with the Rockingham County Registry of Deeds, Record Book 3121, Page 1588; wherein a more detailed description of the premises is set forth.

Filed with:

ROCKINGHAM COUNTY REGISTRY OF DEEDS

#10 Rte 125  Brentwood  NH

Tel:  (603) 642-5526

Discrepancy Codes:
10

When recorded, please return to:
Bank North, N.A.

Document Control Office
BankNorth, Collateral Department
P.O. Box 1977
Lewiston, ME 04240

RECEIVED AND RECORDED
ROCKINGHAM COUNTY REGISTRY OF DEEDS
CATHY ANN STACEY, REGISTER

**Anthony J. Manhart**

| | |
|---|---|
| **From:** | Anthony J. Manhart |
| **Sent:** | Tuesday, April 09, 2013 10:48 AM |
| **To:** | Anthony J. Manhart (tmanhart@perkinsthompson.com) |
| **Subject:** | FW: april 8 |

> **EXHIBIT**
> **C**

ANTHONY J. MANHART
ATTORNEY

**PERKINS|THOMPSON**

ONE CANAL PLAZA, PO BOX 426
PORTLAND, ME 04112-0426
207.774.2635 MAIN
207.871.8026 FAX
www.perkinsthompson.com
tmanhart@perkinsthompson.com

CONFIDENTIALITY AND TAX ADVICE NOTICE:  The information contained in this communication may be confidential or privileged.  If you are not the intended recipient of this communication, any disclosure, copying, distribution or use of this communication is prohibited.  If you have received this communication in error, please notify the sender and immediately destroy this communication.  Any tax advice contained in this communication cannot be used to avoid tax penalties.

**From:** S D [mailto:mugsdeuce@yahoo.com]
**Sent:** Wednesday, April 03, 2013 1:38 PM
**To:** lsp@perreaultlawoffices.com
**Subject:** april 8

Hello Laurie,

I received your letter for continuance until April 8. Will you check with
TDBank to have this continued again . Ido not want  to reilfe the
bankruptcy 7 or have my wife file 13  bu I will if it is the only way to
delay sale while I continue working on others alternatives.The property is
6 Katie lane Hampstead

Thank you
Steve Doucette

This message and any attachments may contain confidential or privileged
information and are intended only for the use of the intended recipients
of this message. If you are not the intended recipient of this message,
please notify the sender by return email, and delete this and all copies
of this message and any attachments from your system. Any unauthorized
disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be
unlawful.